## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| **ARNOLD J. MORRIS, M.D.** § | |
| § | |
| **VS.** § | **NO. A-16-CV-1000 LY** |
| § | |
| **MARI ROBINSON, et al.** § | |

### REPORT AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE

TO:    THE HONORABLE LEE YEAKEL
        UNITED STATES DISTRICT JUDGE

Before the Court are Plaintiff's Motion for Preliminary Injunction (Dkt. No. 23); Defendant Administrative Law Judge Beth Bierman's Response to Plaintiff's Request for Preliminary Injunction (Dkt. No. 29); Plaintiff's Reply to SOAH Defendant's Response (Dkt. No. 33); Board Defendants' Response in Opposition to Plaintiff's Motion for Preliminary Injunction (Dkt. No. 36); and Plaintiff's Reply to Board Defendants' Response (Dkt. No. 38). The District Court referred the above motions to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. §636(b)(1)(A), FED. R. CIV. P. 72, and Rule 1(c) of Appendix C of the Local Rules. This Court held a hearing on the motion on March 1, 2017.[1]

### I. GENERAL BACKGROUND

Plaintiff Arnold J. Morris brings this suit to enjoin the Texas Medical Board's (TMB) Executive Director Mari Robinson, employee Juanita Garner, and board members, and State Office

---

[1] At the hearing, SOAH and the ALJ agreed that they would abide by any decision issued by this Court, and would not proceed to hearing if an injunction were issued against TMB. Morris conceded that he had included SOAH and ALJ Bierman only to have a "belt and suspenders," and agreed they could be dismissed from the case based on their agreement to follow the dictates of this Court. Accordingly, the Court **RECOMMENDS** that SOAH and Bierman be dismissed as defendants. Tr. 19-20.

of Administrative Hearings' (SOAH) Administrative Law Judge (ALJ) Beth Bierman from proceeding with a contested disciplinary process. The TMB is investigating Morris for violations of the standard of care, and filed a SOAH complaint in August 2015. Morris filed this suit on August 23, 2016, alleging the investigation is a bad faith prosecution and should be enjoined.

## II. FINDINGS OF FACT

The Court held a hearing on the motion for preliminary injunction on March 1, 2017. Morris and Texas Rep. William Wade Zedler, who sits on the Texas House Public Health Committee, testified for the Plaintiff. For TMB, Scott Freshour, the Interim Executive Director of the TMB, and Dr. Irvin Zeitler, former President of the TMB, testified.

At the heart of this case is Morris's allegation that this is the thirteenth TMB investigation he had been subjected to in the last ten years. He additionally points out that the TMB opened at least four new investigations this past year—all for non-therapeutic prescribing (or over-prescribing). Morris testified that of the previous twelve investigations, nine were dismissed before reaching the SOAH hearing stage. Of the three that went to a hearing, none ended in a finding of wrongdoing. Morris claims that this, coupled with the expansion of the pending investigation, evidences that TMB is prosecuting him in bad faith, in violation of his constitutional rights.

The TMB investigation began in January 2014, following a complaint made in November 2013 by the wife of one of Morris's patients. This complaint alleged that Morris over-prescribed her husband narcotics for over a year. Morris alleges that the complaint was "ginned-up," but on the stand agreed that the TMB did not self-generate this complaint. Morris states that the investigation began with a subpoena for the medical records of the single patient referred to in the complaint, but before he was given an opportunity to respond to the initial subpoena, the investigation was

expanded and the TMB issued a subpoena for the records of fourteen additional patients. Morris opined that this subpoena would require him to produce over ten thousand pages of medical records, resulting in a significant burden on his time and resources. Additionally, the patient from the original complaint is no longer involved in the investigation. Freshour testified that the TMB sought the additional records after the investigator—noting a history of similar investigations—searched the Prescription Access in Texas (PAT) database and believed that a possible pattern or practice of non-therapeutic prescribing may exist, warranting further investigation. Morris testified that this search of the PAT database and subsequent expansion of the investigation prior to even receiving his response to the initial complain violated his constitutional rights.

      Morris called Rep. Zedler to corroborate this. Zedler testified that he was originally called by Morris to look into this case after Morris received the second subpoena. Zedler was known to physicians, as he had frequently sat in on informal settlement conferences (ISC's) with physicians and had been vocal about what he perceived to be due process violations by the TMB. While he originally received his knowledge directly from Morris, he claims that he was able to corroborate the information given to him by looking at the case file. This led to an email conversation with then Board President, Dr. Zeitler. Zedler claims that in this exchange, he asked Zeitler what the basis for the TMB's expansion of the investigation was, and that Zeitler responded that, in his opinion, there was "no reason" for the expansion.

      In his testimony, Zeitler disputed this. He clarified that the discussion began with Zedler asking for information on this particular case, and at that time he had no prior knowledge of the case and indicated this to Zedler. He stated that in his phone conversation with Zedler, they spoke only in hypotheticals. After this initial conversation, both Zeitler and Zedler reviewed the information

produced from the PAT database, which led to the follow-up email conversation (which is in the record). In the emails, Zeitler stated that—without looking at the case more fully—the expansion of the investigation that Zedler had described appeared to be consistent with board policies and procedures, especially given Morris's history with the TMB and the pattern revealed by the PAT database. In his testimony, Freshour agreed with this assessment, noting that it was standard procedure when there is a complaint of non-therapeutic prescribing for the TMB to review the PAT database, and, if anomalies are seen, to expand the universe of patient files to investigate whether a pattern of non-therapeutic prescribing exists.

Freshour testified that all normal procedures were followed in this investigation. Both Morris and Zedler contended in their testimony that the process for creating the expert report used in the ISC was flawed and resulted in due process violations. In his testimony, Freshour rebutted this, noting that TMB's process was to consult with two board-certified physicians within the field of the physician being investigated. Each of the two physicians would individually review the records and determine whether there had been a violation of the standard of care. If both doctors found a violation, the case would move forward; if neither found a violation, the case would be dismissed. However, if only one physician found a violation, a third would be appointed and would be the deciding vote. Freshour pointed out that the process called for the experts to be drawn from a different geographic region from the physician being investigated to avoid any conflicts of interest, and TMB's policy called for it to defer to their findings. Again, Freshour testified that all procedures and policies were followed by TMB in these proceedings.

In this investigation, two experts—one board certified anesthesiologist with additional qualifications in pain management, and one board certified family medicine specialist—found Morris

had committed violations of the standard of care for six of the fifteen patients whose charts they examined (not including the patient from the original complaint). Dkt. No. 36-8. All six of the alleged failures to meet the standard of care related to allegations of non-therapeutic prescribing. *Id.* The ISC was unsuccessful and the SOAH complaint was filed and set for a hearing.[2] Morris then filed this case, and moved for a preliminary injunction to enjoin the TMB from proceeding forward with the hearing against him.

## II. LEGAL STANDARD

The purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can be held. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). A preliminary injunction is an "extraordinary and drastic remedy" which is never awarded as of right. *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A party seeking a preliminary injunction must demonstrate the following factors:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Texans for Free Enterprise v. Texas Ethics Comm'n*, 732 F.3d 535, 537 (5th Cir. 2013) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)).

---

[2] The SOAH hearing was originally set for March 6, 2017. Based on this, on February 14, 2017, Morris filed a motion to expedite the preliminary injunction motion. The motion for a preliminary injunction was referred to the undersigned on February 21, 2017, and the Court then directed the parties to identify a date for a hearing. The agreed upon date was March 1, 2017, just five days before the SOAH hearing was scheduled to commence. At the injunction hearing, SOAH agreed to move its hearing to the week of April 24, 2017—a concession the Court appreciates very much, as it permitted the Court sufficient time to consider the many issues raised in this case.

### III. ANALYSIS

Morris's suit is premised on the claim that TMB's investigation has been brought in bad faith prosecution, in violation of his constitutional rights. He argues that TMB, by pursuing this thirteenth investigation in which he has been targeted, and expanding its scope prior to even receiving his response, violated his Fourth Amendment rights, his substantive and procedural Due Process rights, and the Equal Protection clause. TMB argues that Morris has not proven a likelihood of success on the merits of each of these claims.

**A.     Younger Abstention**

First, as the parties agree, the *Younger* abstention doctrine has potential application here. *See Younger v. Harris*, 401 U.S. 37 (1971) (federal court should not enjoin state criminal prosecution when party has an adequate remedy at law and will not suffer irreparable injury); *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982) (extending application of the *Younger* abstention doctrine to state bar disciplinary proceedings). The issue in dispute is whether the exception courts have recognized to the *Younger* doctrine for prosecutions taken in bad faith is applicable here. *See Bishop v. State Bar of Texas*, 736 F.2d 292, 294 (5th Cir. 1984). The TMB defendants filed a motion to dismiss based on *Younger*, and that motion is currently pending. *See* Dkt. Nos. 26, 32. In brief, Morris's response to the argument that the Court should abstain from this case is that he has been the subject of twelve previous investigations by the TMB, none of which resulted in a finding of misconduct by him.[3] He contends that this is sufficient to at least raise a plausible claim that this dispute falls within the bad faith prosecution exception to the *Younger*

---

[3] The evidence was that in nine of these proceedings, the cases were dismissed prior to a hearing, and in the other three cases Morris prevailed at the hearing stage.

abstention doctrine. Although the motion to dismiss has not been referred to the undersigned, as will be seen in what follows, the evidence at the preliminary injunction hearing does not demonstrate that the TMB's proceedings against Morris have been brought in bad faith. Thus, it does not appear that Morris can demonstrate that his case falls within the bad faith prosecution exception to *Younger* abstention. As a result, it appears that not only should a preliminary injunction be denied, but also that this case should be dismissed based on the *Younger* abstention doctrine.[4]

**B.    Likelihood of Success**

Morris has failed to show a substantial likelihood of success on the merits. Though Morris's pleadings are not a model of clarity, he appears to be asserting a claim under Section 1983, alleging that he is being subjected to a bad faith prosecution. But § 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (internal quotations omitted). To state a claim under § 1983, a "plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Moore v. Willis Indep. Sch. Dist.*, 533 F.3d 871, 874 (5th Cir. 2000). Here, the only question at issue is whether Morris has alleged the violation of a right secured by the Constitution or the laws of the United States.

The Court pressed Morris's counsel at the hearing to delineate the Constitutional right he contends has been infringed here. In Morris's letter brief filed after the hearing, he first alleges that

---

[4]Though the district judge has referred the motions to dismiss to Magistrate Judge Lane, in the event the recommendations contained herein are adopted, it would be appropriate for the district judge to withdraw the reference of the motions to dismiss, and grant those motions based on the findings herein that the TMB's proceedings have not been brought in bad faith.

bad faith prosecution is by itself an independent cause of action under Section 1983. Alternatively, he contends that the TMB's bad faith prosecution violated his Fourth and Fourteenth Amendment rights. Morris relies first on the prior prosecutions by TMB to support this claim, Dkt. No. 23 at 4, and also his assertions at the hearing that: (1) the TMB's initial complaint here was self-generated by members of the TMB; (2) the expert report was improperly created;[5] and (3) the investigation was "expanded" prior to even receiving his response. The expansion of the investigation dominated Morris's argument at the hearing, as demonstrated by this exchange between Zedler and Morris's attorney:

> Q: If you start out with a lie and then you add ten layers of due process, does that make it fair?
>
> A: No.
>
> Q: So what was the underlying basis of the problem you saw early on in this investigation before it reached ISC and before it reached SOAH?
>
> A: The underlying problem, as I saw it, was that, before the board ever received his response and had a chance to even look at it, they had already filed or sent him a subpoena for expansion. And I think it was for 14, 15 patients. And that was when I said, this is wrong. . . . Because – because if you can imagine having to submit 10,000 pages of information to the board . . . . [B]asically, that's—that's the problem, this expansion into all these other patients. I think there needs to be some evidence of—of non-therapeutic prescribing. How do you know that there's non-therapeutic prescribing going on if you haven't even received the response or looked at the response of the first patient?

Tr. 61–62. Though Morris's actual claims remain poorly defined, in what follows, the Court will address whether any the actions Morris criticizes are enough to demonstrate a substantial likelihood of success on Morris's claim that TMB violated his constitutional rights.

---

[5]Morris originally alleged that he never received a copy of the expert report, but only portions of it. However, this claim appears to have been dropped, and Representative Zedler stated that he believed Morris received a copy. Tr. 58–59.

### 1. Constitutional Tort of Malicious Prosecution

First, Morris relies on a series of cases beginning in 1972 to allege that the TMB violated his constitutional right to be free from bad faith prosecution. In *Shaw v. Garrison*, the Fifth Circuit stated that a person has a "federal right to be free from bad faith prosecutions." 467 F.2d 113 (5th Cir. 1972). Over time, this evolved into what was considered to be a freestanding constitutional right against malicious prosecution. For example, in *Wheeler v. Cosden Oil & Chemical Co.*, the Fifth Circuit cited *Shaw* for the proposition that under the Fourteenth Amendment, there is a "duty on state prosecutors to charge only upon ascertaining probable cause." 734 F.2d 254, 260 (5th Cir. 1988). Relying on the state tort of malicious prosecution, the court in *Wheeler* found a cause of action under Section 1983.

In 2003, however, the Fifth Circuit revisited this line of cases in *Castellano v. Fragozo*, 352 F.3d 939, 946 (5th Cir. 2003). In *Castellano*, the Fifth Circuit clarified the law after the Supreme Court's decision in *Albright v. Oliver*, 510 U.S. 266, 271 (1994), and concluded that "no such freestanding constitutional right to be free from malicious prosecution exists." 352 F.3d at 945. The court further explained, "such claims of lost constitutional rights are for violation of rights locatable in constitutional text, and some such claims may be made under 42 U.S.C. § 1983. Regardless, they are not claims for malicious prosecution and labeling them as such only invites confusion." *Id.* at 953-54; *see also Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 812-13 (5th Cir. 2010) ("[Plaintiff's] attempt to assert a free-standing § 1983 malicious prosecution claim [under the Fourth Amendment] fails as a matter of law."). As such, an arrest without probable cause would not present a substantive due process violation standing alone. *Castellano*, 352 F.3d at 945. 35

On the other hand, the *Castellano* court did not rule out the possibility that a Fourteenth Amendment substantive due process violation might still present itself in certain circumstances. In fact, the court stated that "additional government acts that may attend the initiation of a criminal charge could give rise to claims of constitutional deprivation." *Id.* at 953. Thus, the court found that a police officer giving false testimony at trial would likely violate the defendant's substantive due process rights—though ultimately the officer would have absolute immunity. *Id.* at 958. At the end of the day, the main ruling of *Castellano* was that malicious prosecution, as defined by state tort law, cannot be brought as a freestanding claim under § 1983.

Confronted with this problem, Morris offers two arguments in support of his claims. The first is that the *Castellano* line of cases apply solely in the criminal context.[6] However, the requirement of a constitutional basis also applies in the context of administrative proceedings. In *Doe v. Louisiana*, decided after *Albright* but before *Castellano*, the court stated that malicious prosecution in a civil proceeding may give rise to constitutional violations when the litigation conduct is "so egregious as to constitute a violation of § 1983," and "subjects the tort-victim to a deprivation of constitutional dimension." 2 F.3d 1412, 1419 (5th Cir. 1993) (quoting *Beker Phosphate Corp. v. Muirhead*, 581 F.2d 1187, 1189 (5th Cir. 1987)). *Doe* went on to state that only two cases have reached this level of egregious behavior to constitute a constitutional violation. *Id.* at 1420 (citing *Vinson v. Campbell Cty. Fiscal Court*, 820 F.2d 194 (6th Cir. 1987) and *Cale v.*

---

[6]Morris contends that Texas only recognizes a malicious prosecution action if it arises out of a criminal prosecution. Morris cites to *Richey v. Brookshire Grocer Co.* to support this proposition. 952 S.W.2d 515, 517 (Tex. 1997). While one of the factors in that test is the end of a criminal prosecution, in another Texas Supreme Court case, the court addressed the factors for a civil malicious prosecution claim. *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 206 (Tex. 1996). Morris is thus incorrect; Texas law does provide a cause of action for malicious prosecution for civil as well as criminal cases.

*Johnson*, 861 F.2d 943 (6th Cir. 1988)). Thus, in civil proceedings—as well as criminal—there is a requirement that the alleged malicious prosecution be sufficiently severe so as to amount to a "deprivation of constitutional dimension." Morris's argument on this point therefore fails.

Second, Morris argues that he is not asserting a claim for malicious prosecution, but rather for bad faith prosecution, and this is a cognizable claim under Section 1983. To the extent that Morris is arguing that bad faith prosecution—as opposed to the constitutional tort of malicious prosecution—is a separate constitutional violation, this argument also fails. In *Flowers v. Seki*, the court found that neither the constitutional tort of malicious prosecution nor a finding of bad faith prosecution (as defined in the *Younger* abstention analysis) is a freestanding claim under Section 1983. 45 F. Supp. 2d 794, 805-06 (D. Haw. 1998) ("While *Younger*, and the cases following it, discuss bad faith, they do not create a cause of action for bad faith. . . . As it stands today, without more, such a constitutional tort does not exist . . . ."), *aff'd* 176 F.3d 482 (9th Cir. 1999).[7] Rather, the court in that case addressed whether the alleged bad faith prosecution—and the facts that gave rise to it—would support a finding of a violation of an enumerated constitutional right. *Flowers*, though not from the Fifth Circuit, is persuasive here as it has facts that are similar to those in the current case. Moreover, this holding is consistent with Fifth Circuit case law. *Cf. Hand v. Gary*, 838 F.2d 1420, 1424-26 (5th Cir. 1988) (using "bad faith" and "malicious" prosecution interchangeably). Thus, *Younger* did not create a new cause of action for bad faith prosecution, and if Morris wishes

---

[7]The Ninth Circuit affirmed this holding, noting that "although the district court previously stated in general terms that the right to be free from bad faith prosecution was protected by the Constitution, it had not determined that [this] specific cause of action was cognizable under section 1983." *Flowers v. Seki*, 176 F.3d 482 (9th Cir. 1999). It then went on to say that "[t]he district court was correct in concluding that [the plaintiff's] claim for bad faith prosecution was insufficient to state a claim under section 1983." *Id.*

to raise such a claim he must do so within the boundaries of the very narrow malicious prosecution claim the Fifth Circuit recognizes—which requires a showing of an independent violation of a constitutional right. *See Graham v. Connor*, 490 U.S. 386, 395 (1989).

### 2.     **Fourth Amendment Claim**

In an attempt to meet this burden, Morris argues that the TMB's "bad faith prosecution" violated his Fourth Amendment rights. Specifically, he contends that the TMB violated his Fourth Amendment rights by instituting proceedings against him without probable cause. The Supreme Court has held that for a Fourth Amendment violation, there must be "an intentional acquisition of physical control." *Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1989). A "summons, coupled with the additional liberty restrictions . . . may constitute a seizure under the Fourth Amendment." *Evans v. Ball*, 168 F.3d 856, 861 (5th Cir. 1999). Morris, however, has not established that he has been subjected to any liberty restrictions; he has not been arrested or subjected to a bond or travel restrictions, as was the case in *Evans*. In fact, Morris's complaint is more analogous to the plaintiff in *Becker v. Kroll* in the Tenth Circuit, where the plaintiff was being investigated by the state Medicaid Fraud Control Unit. 494 F.3d 904, 909. There, the court found that the burdens on time and finances were not enough to support a seizure under the Fourth Amendment. *Id.* at 916. As in that case, Morris is unable to allege more than impositions on his time and finances, which are insufficient to establish a "seizure."

Morris additionally argues that the scope of the investigation was "expanded" without probable cause. However, an agency is not required to have probable cause to issue an administrative subpoena. *U.S. v. Zadeh*, 820 F.3d 746, 756 (5th Cir. 2016). Rather, administrative subpoenas "are limited by the general reasonableness standard of the Fourth Amendment . . . not by

the probable cause requirement." *Id.* (quoting *In re Subpoena Duces Tecum*, 228 F.3d 341, 348 (4th Cir. 2000)). As is clear from the testimony at the hearing, in cases like that involving Morris, it is standard procedure for the TMB to seek additional records from a physician even before receiving a response. Freshour testified that:

> Q: Mr. Freshour, could you explain to the Court what the policy is for the expansion of an existing investigation?
>
> A: Yes. When – when an investigation is assigned to an investigator, if there is evidence of same or similar ongoing violations or if there is a history of the same or similar violations, whether or not there has been disciplinary action resulting from those or even if they were dismissed, it can be expanded to see if there is a pattern of practice related to that physician. Again, a prime example of that is when we have historically or had several complaints on a physician about their prescribing practices, whether or not they've been dismissed, if you get a new complaint, you can expand to look at further patients to be sure you get a true representative sample of what's going on, because one patient may or may not demonstrate it. Even in cases where there may not be a history, if the complaint relates to over-prescribing, that gives authority to be sure that it – to expand to look at other patients to determine is it a pattern or could it be just an isolated incident, to be sure that you get a true representative sample. . . .
>
> Q: Can you explain what the expansion meant [in the SOAH case]?
>
> A: Well, yes. What it meant in this case was that Dr. Morris has – and, as by his own testimony, had been subject to prior investigations related to prescribing. In addition, when this complaint came in, it was a complaint about prescribing practices with a – with a patient. And given that, along with the authority to expand, we – our investigator expanded to look and see if it was a pattern of practice in this particular case. The standard is to get a true representative sample as best you can, and normally expand between 10 to 15 patients. And that is the standard sample that – that the investigator will look at when they have a prescribing case.
>
> Q: Now, is that the practice of the TMB in every over-prescribing case?
>
> A: In most over-prescribing cases, yes. Particularly if there has been same or similar allegations dismissed or not, because there is also a board rule that talks about any dismissal is without prejudice to further – to looking back at

13

>    those for purposes, not to necessarily reinvestigate, but to show if there's a pattern or that there's been a prior history of notice of concerns of the medical board.
>
> Q:    So is it your testimony today, then, that there was nothing out of the ordinary about looking at the PAT database to examine Dr. Morris's prescribing history in relation to [the SOAH case]?
>
> A:    No. There was nothing out of the ordinary. In fact, it was consistent with board policy and procedures.

Tr. 77–81. Thus, it appears that this "expansion" is not only typical, but necessary for the investigation. The only fact cited by Morris to rebut this testimony was the large number of pages subpoenaed. However, this fact alone would not make the subpoena unreasonable, particularly in light of the reasons cited for this policy.

### 3. Substantive Due Process

As discussed above, malicious (or bad faith) prosecution—standing alone—is not a substantive due process violation. Instead, the Fourteenth Amendment "protects against arbitrary acts of government by promoting fairness in procedure and 'by barring certain government acts regardless of the fairness of the procedures used to implement them.'" *Castellano*, 352 F.3d at 958. To find a substantive due process violation, the conduct of the state actor must "shock[] the conscience." *See Rochin v. California*, 342 U.S. 165, 172 (1952). Here, Morris relies on *Shaw* and its progeny to argue that a finding of bad faith (as referred to in *Younger*) would support a finding of a substantive due process violation. As discussed previously, this has not been the law in this circuit for some time. Moreover, the initiation of an investigation without probable cause does not, without more, create a substantive due process violation. Though the evidence of twelve previous, unsuccessful investigations might be enough to support an allegation of bad faith sufficient to state

a claim, that would only be sufficient to survive a Rule 12(b)(6) motion. The number of failed investigations, without more, is not enough to prove a substantive due process violation.

Further, Morris has failed to allege any conduct that would shock the conscience. Again, as mentioned previously, Freshour noted that after receiving a complaint of non-therapeutic prescribing, it is not unusual for the TMB to seek medical records from additional patients if a review of the PAT suggests there is a pattern of such prescribing. Tr. 81. In fact, looking at Morris's history of past TMB investigations, Freshour stated that this was "consistent with board policy and procedures." *Id.* The mere fact that the subpoena produced so many documents does not "shock the conscience" such that it would constitute a Fourteenth Amendment violation. Nor did Morris present any evidence that the complaints were "ginned up," as Morris himself admitted that the initial complaint came from the family member of a patient. Tr. 39.[8]

Morris also argues that the expert reports accusing him of not meeting the standard of care were faulty or inappropriate in some way. For example, Morris stated that the experts are "instructed to find everybody guilty." Tr. 35. Ironically, this is rebutted by the fact that Morris had nine previous investigations dismissed before they reached a SOAH hearing. Rep. Zedler went further than Morris, stating "I've seen instances where expert witnesses misrepresented the facts," and noted that he thought it happened in this case. Tr. 59. When asked to provide his basis for this belief, however, he was unable to provide one. *Id.* In contrast, Freshour stated directly that the TMB never interferes with the work of the experts, and refuted the proposition that the TMB "ginned up" the

---

[8]Indeed, it also is not clear that even if the TMB self-generated the complaint that this would necessarily violate due process. On cross, Freshour stated that at times the TMB can self-generate complaints when, for example, "a newspaper article . . . says a doctor was arrested in a raid or something like that." Tr. 88. Regardless, this is not the case here.

expert report. Tr. 86–87 ("Whatever the experts say, we go with. So if they say dismiss, we dismiss. If they say there's a–a violation of standard of care, the case will go forward."). He additionally pointed out that the TMB chooses the experts "in the same or similar practice, but [makes] sure they're not competitors, they're not in the same geographic area." Tr. 87. Further, the thoroughness and detail of the experts' report in this case, by itself, rebuts Morris's assertions. The hearing evidence strongly rebuts Morris general, vague claim that the experts are somehow biased against doctors under investigation.

    **4.**    **Equal Protection**

Morris also alleges the TMB's actions violate his rights under the Equal Protection clause. This claim, however was never mentioned in the brief and only mentioned in passing at the hearing. Counsel never addressed specifically how the TMB inequitably applied its procedures. In fact, the only reference to the TMB potentially acting inequitably came from Zedler, who stated: "The deal is, is that do [the board members] look into every doctor who does exactly the same thing? My suggestion is they don't." Tr. 50. However, this conclusory allusion to a potential "class of one" equal protection claim is insufficient to support a preliminary injunction. *See Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (allowing a claim for a class of one "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment") .

    **5.**    **Procedural Due Process**

Finally, Morris asserts his procedural due process rights have been violated. The Fourteenth Amendment prevents States from depriving citizens of property without due process of law. U.S.

CONST. amend. XIV § 1. "[A] reasonable, continued expectation of entitlement to a previously acquired benefit, such as a medical license, constitutes a cognizable property interest for purposes of due process protection." *Ramirez v. Ahn*, 843 F.2d 864 867 (5th Cir. 1988). To prevail on a procedural due process claim, a plaintiff must show that (1) he or she has a recognized property or liberty interest and (2) was deprived of that liberty or property interest without adequate notice or meaningful opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 332–35 (1976). "[T]o determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate." *Zinermon v. Burch*, 494 U.S. 113, 126 (1990). The requirements of procedural due process are "flexible and call[ ] for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). At a minimum, due process requires that notice and an opportunity to be heard "be granted at a meaningful time and in a meaningful manner." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (citation and internal quotation marks omitted). The ultimate requirements of due process are dependent on three factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews*, 424 U.S. at 335.

As is clear from Freshour's testimony at the hearing, in these proceedings Morris has received, and will receive, more than constitutionally sufficient process. As Freshour noted, pointing to the detailed flow chart admitted at the hearing showing the process physicians receive in these

proceedings, "every single step was followed by the board as laid out from the due process standpoint procedure that's delineated on this chart." Tr. 76. Morris has never argued that the TMB's procedures are deficient. Moreover, as noted on multiple occasions already, Morris provided no evidence that the complaint was self-generated or that the experts were inappropriately influenced by board members. In fact, the expert report is detailed and carefully reasoned. Similarly, the complaint, generated by the wife of a patient, is sufficiently detailed to begin an investigation.

This merely leaves the "expansion" of the TMB's investigation into Morris's prescribing for other patients, which he has not shown violated his due process rights. He argues that because TMB expanded the investigation prior to receiving his response to the initial complaint, the prosecution cannot possibly be in good faith. However, as noted by Freshour, it was standard practice to do so in cases alleging non-therapeutic prescribing. Tr. 77–81. Nor does Morris point to any legal authority to support his argument; indeed, it would be difficult to do so as the TMB followed its procedures and issued its subpoena according to Texas law. Moreover, as shown by the evidence presented, Morris was given an opportunity to object to the subpoena—and took the opportunity to do so. Morris's procedural due process claim is unsupported by the evidence.[9]

## IV. RECOMMENDATION

In accordance with the foregoing discussion, the Court **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Preliminary Injunction (Dkt. No. 23).

---

[9]As it is readily apparent from the above discussion that Morris has not shown a likelihood of success on the merits, the Court need not address the remaining three preliminary injunction factors.

## V. WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-153 (1985); *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428-1429 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 24th day of March, 2017.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE